1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9

DARRYL HUDSON,                                    No. C 13-3782 JSW (PR)

10          Petitioner,                           **ORDER DENYING PETITION**
                                                  **FOR WRIT OF HABEAS**
11    v.                                          **CORPUS; DENYING**
                                                  **CERTIFICATE OF**
12                                                **APPEALABILITY**

R. DIAZ, Warden,

13          Respondent.

14 _____ /

15

**INTRODUCTION**

16

Petitioner a prisoner of the State of California filed a pro se petition for a writ of

17 habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his criminal

18 conviction and sentence in state court.  Respondent filed an answer to the petition, to

19 which Petitioner filed a traverse.  For the reasons set forth below, the petition is

20 DENIED.

21

**BACKGROUND**

22

In 2007, Petitioner and a co-defendant, Montrell Hall, were charged with killing

23 Rex Farrance during an attempted robbery and burglary with a firearm.  See Cal. Pen.

24 Code §§ 187(a), 190.2(a)(17), 12022(a)(1).  They were also charged with two counts of

25 robbery in the first degree, with enhancements for using a gun and acting in a group of

26 two or more.  *See* Cal. Pen. Code §§ 211, 212.5(a), 213(a)(1)(A), 12022(a)(1).  In

27 addition, they were charged with one count of assault on Lenore Farrance, and one count

28

United States District Court
For the Northern District of California

of first-degree burglary.  *See* Cal. Pen. Code §§ 459(a), 460(a), 12022(a)(1).  A third co-defendant, Cleothius Amos, pled guilty and testified for the prosecution, and a fourth participant in the crime was never identified.

In June 2009, the jury found Petitioner guilty on all counts but deadlocked on the charges against Hall.  Hall was retried and a new jury found him guilty on all counts in October 2009.  The trial court sentenced Petitioner and Hall to a term of life without the possibility of parole on the murder count.  They also received sentences on the other counts of eight and 11 years, respectively, to be served prior to the life term.

The judgment was affirmed by the California Court of Appeal, with some sentencing corrections not at issue here.  The California Supreme Court denied petitions for review, and later denied Petitioner's petition for a writ of habeas corpus.  Petitioner thereafter filed the instant federal habeas petition, which was subsequently amended on October 20, 2014.[1]

The California Court of Appeal summarized the evidence presented at trial as follows:

> Rex Farrance and his wife, Lenore Farrance, were living at 86 Argosy Court in Pittsburg in January 2007.[] Some months before that time, the Farrances discovered their 20–year–old son, Sterling, was growing marijuana in his closet in the home. Sterling explained to his parents he had a medical prescription to use and grow marijuana for himself. Rex decided to assist Sterling, and worked with him to expand the growing operation into the house's unused attic. Sterling was also assisted by his childhood friend, Michael Mikulik, who also had a medical marijuana prescription.

> Sterling moved out of the Argosy Court residence in October 2006, but he remained involved in the growing operation with Rex, as did Mikulik to a lesser extent. According to Sterling, they had gone through three or four grow-and-harvest cycles in the attic, with the last one occurring less than a week before his father was killed. Sterling estimated each harvest would yield approximately one pound of marijuana at the most, which would have had a street value of $3,500 to $4,500 at that time. At the time his father was killed, they had plants growing in the closet and attic, and harvested marijuana drying in the garage. Sterling thought the amount in the home at that time was worth "probably less" than $4,000. According to Sterling, who testified under a grant of immunity, none of the marijuana grown in the home was sold. He and Mikulik smoked some of it themselves, and gave the rest away to friends. Neither Sterling nor Mikulik

[1]The amended federal petition is the operative petition.

believed Rex sold any of the marijuana. Mikulik had the impression Rex, who worked as a senior technical editor for PC World magazine, viewed the growing operation as an enjoyable hobby.

On January 9, 2007, Lenore was bedridden while recovering from foot surgery the day before. Rex stayed home from work to take care of her. Sterling and Mikulik came by at 4:00 p.m. or 5:00 p.m. that day, but both had left by later that evening. In the evening, Lenore heard a loud bang followed by her dog barking. Then Rex burst into the bedroom saying, "Some guys are breaking in." He went to his side of bed, and reached under the bed where he kept handguns locked in a safe. Within seconds, he was overtaken by three men who followed him into the room.[2]

The intruders all wore black clothes and dark masks, but Lenore could see their skin above the gloves they wore and at the eye holes of some of their masks. Based on that, as well as from their size, body type, and voices, Lenore testified she could tell all four were Black males. All of the men in the room had guns. They demanded money and threatened to kill her if none was found. As one intruder held Rex at gunpoint, another grabbed Lenore by her throat and nightgown, pulled her off the bed onto her injured foot, and said, "Where is the money, bitch?" After searching unsuccessfully for an envelope of emergency money in her husband's top dresser drawer, she was struck on the back of the head and collapsed to the floor, bleeding from the wound to her head. She hear Rex gasp, then saw in "slow motion" the barrel of the gun held on him turn red and the fabric of his shirt "splay open" as he was shot in the chest. She believed Rex gasped because he saw blood coming out of her head. The intruders ran and were gone. Lenore was able to reach Rex where he lay in the bedroom doorway with his legs in the bedroom. A nurse by profession, Lenore tried to do CPR while she called 911 on the bedside phone. The call was received at 9:11 p.m. and police responded to the scene at 9:14 p.m.

Rex was taken by ambulance to John Muir Medical Center where he was pronounced dead at 9:59 p.m. An autopsy revealed Rex died of a single gunshot wound to his right chest. Based on the shape and location of the entrance and exit wounds, it appeared the victim was shot from above while on his knees or buttocks, by an assailant standing a few feet away. Police found an expended .22–caliber bullet on the carpet at the entrance to the master bedroom of the Argosy Court residence.

At the crime scene, investigators found the front door splintered, several bags of marijuana in the hallway, and a pervasive odor of marijuana throughout the residence. The master bedroom had been ransacked and the mattress had been pulled off of the bed. Officers found bags containing trimmed marijuana in the bedroom. An envelope containing $700 in currency was found in a dresser drawer. A narcotics officer found mature marijuana plants hanging in the garage, and 75 immature plants in the attic, as well as 11 glass jars of marijuana in the master bedroom. Interviews with Lenore and Sterling established that the gun safe under the bed, containing four handguns registered to Rex, was

---

[2]In the first trial, Lenore testified three men entered the bedroom and another was in the hall. In the second trial, she testified four men entered and two went back out into the hall. Amos, who was one of the men who entered the home, testified there were four of them, but he denied knowing the fourth man's name.

3

missing from the home.

On January 15, 2007, following pursuit of a fleeing vehicle in Bay Point, police arrested the vehicle's occupants and recovered a .22–caliber handgun that had been tossed from it during the pursuit. The car was registered to Cleothius Amos, and the vehicle's driver and passenger were Amos's brothers. Two .22–caliber bullets were found in the front seat. A firearms expert who examined the handgun later reported his "100 percent certain" opinion it had fired the bullet found at the scene of Rex Farrance's murder. Amos, who was arrested on January 21, 2007 after a police chase in Sacramento, initially denied any knowledge of the Farrance robbery-murder. At the end of May 2007, the police investigating the robbery-murder learned Hall and Hudson had been with Amos in Sacramento on January 21, and Amos's girlfriend, Sabrina Bagsby, had been a passenger in the vehicle he was driving when he was arrested on that date.

On June 1, a Browning .22–caliber semiautomatic pistol registered to Rex Farrance was recovered when the police assisted Bagsby in retrieving her possessions from the home of her ex-boyfriend, Omar Zuniga. Five days later, police interviewed Jalil Aldridge, who had obtained the Browning .22 from Hudson and arranged for its sale to Zuniga. Aldridge confirmed Zuniga's statement that Amos, Hudson, and Hall were involved in the Farrance robbery-murder. When Amos was interviewed again in September 2007, he confessed his involvement in the events of January 9, and implicated Hall and Hudson. Although he initially portrayed the events falsely as a marijuana purchase gone bad rather than a robbery—a scenario his interrogators proposed to get him to admit his involvement—he provided information and leads that enabled the police to identify the other defendants and gather evidence of his involvement.

Eventually, Amos provided the following account of the events of January 9: Amos was called that day by Hall about doing a "weed and money lick,"[3] which Hall said would be "easy." Amos was not surprised about the call because Hall and Hudson knew Amos had done robberies before. Amos was with Sabrina Bagsby at the time. He dropped her off and drove to a house on Harbor Street in Pittsburg to meet with Hall and Hudson and another man he did not know, at about 7:00 or 8:00 o'clock that evening, to plan the robbery.[4] Amos asked Hall questions about the robbery and Hall answered them.

Amos and Hall, armed with automatics, Hudson, armed with a .22–caliber revolver, and the fourth man, unarmed, left the Harbor Street house dressed in dark clothes and carrying masks. Following Hall's directions, Amos drove them in his Ford Probe to 86 Argosy Court, where Hall and Hudson entered first and headed toward the back of the house, followed by Amos and the fourth man after they searched to make sure no else was in the house. In the bedroom, Amos saw a woman on the bed. He

---

[3]Lick" is slang for a robbery.

[4]The house was leased to a friend of Hall's and Hudson's named James High. High's mother, Linda High, was a cosigner on the lease. Hudson lived at the Harbor Street house and Hall sometimes stayed there. James High saw Hudson many times with a small .22–caliber pistol or "deuce deuce" that he routinely carried.

United States District Court
For the Northern District of California

heard Hall or Hudson say someone else was in the house and threaten to kill the woman if she did not tell them where the other person was. At that point, a man came up from behind the bed with his hands up and the fourth man began to hit him with his fists. Amos began searching the room for things to take, and picked up a wicker basket with 25 or 30 glass jars of marijuana and left the room, grabbing a bag of loose marijuana he carried with the wicker basket to his car. Amos put the marijuana in the trunk and went back into the house. When he went back in, the others were searching the bedroom and had flipped up the mattress on the bed. Amos left to search the front of the house. After about a minute he heard a shot. He ran to the car, and Hall and the fourth man came right out behind him. Then Hudson came out carrying a gun safe. Hudson ran back inside once more and came back out with two laptop computers. As soon as Hudson got into the car, Amos drove off. There was an argument in the car. Hall told Hudson he was stupid for shooting the man, and Hudson replied he had only shot him in the leg.

James High told detectives that Hudson, Hall, and Amos returned to the Harbor Street house on January 9 carrying bags of marijuana and a gray metal box, excited because they had "hit a lick and come up big." They watched a news story about the crime on television and were "laughing and acting jovial" at first. When they heard the man had been killed, they seemed shocked and quieted down. Hudson used the television's rewind function to play the news report over and over again.

Rex Farrance's gun safe was ultimately recovered from a backyard behind the Harbor Street house. A laptop computer Linda High had sold to a third person on behalf of Hudson for $250 or $350 was also identified as one of Rex's computers taken from the house. Amos testified Hall sold a half-pound of the marijuana the evening of the robbery and gave each of them $450 of the proceeds.

*People v. Hudson*, 2012 WL 676404, *2-4 (Cal. Ct. App. Feb. 29, 2012).

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d). The first prong applies to both questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor,* 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

5

1    A state court decision is "contrary to" Supreme Court authority, that is, falls under

2  the first clause of § 2254 (d)(1), only if "the state court arrives at a conclusion opposite

3  to that reached by [the Supreme] Court on a question of law or if the state court decides a

4  case differently that [the Supreme] Court has on a set of materially indistinguishable

5  facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable

6  application of" Supreme Court authority, falling under the second clause of § 2254

7  (d)(1), if it correctly identifies the governing legal principle from the Supreme Court's

8  decisions, but "unreasonably applies that principle to the facts of the prisoner's case."

9  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because

10  the court concludes in its independent judgment that the relevant state-court decision

11  applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather,

12  the application must be "objectively unreasonable" to support granting the writ. *Id.* at

13  409.

14    Under 28 U.S.C. § 2254 (d)(2), a state court decision "based on a factual

15  determination will not be overturned on factual  grounds unless objectively unreasonable

16  in the light of the evidence presented in the state-court proceeding." *Miller-El,* 537 U.S.

17  332 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

18    When there is no reasoned opinion from the highest state court to consider

19  AEDPA's standard for relief has been met, the Court looks to the last state court to deny

20  the claims in an explained opinion. *See Ylst v. Nunnemaker,* 501 U.S. 797, 801-06

21  (1991).  For the claims discussed below, the last explained state court opinion is the

22  California Court of Appeal's affirmance on direct appeal.

### DISCUSSION

24    Petitioner claims that: (1) his constitutional rights were violated because one of

25  the jurors caused his jury to be racially biased against him; (2) his rights to due process

26  and equal protection were violated because there was insufficient evidence to prove his

27  guilt beyond a reasonable doubt; (3) trial counsel was ineffective in failing to introduce a

28  video recording of a news broadcast covering the crimes; and (4) appellate counsel was

**United States District Court**
For the Northern District of California

1   ineffective in failing to raise a claim of prosecutorial misconduct on appeal.

2   I.   <u>Jury Bias</u>

3          Petitioner claims that two "actions" by one of the jurors (Juror No. 9) led to his

4   being tried by a racially biased jury, in violation of his rights to equal protection, due

5   process and an impartial jury.  First, Juror No. 9 informed the trial judge of comments by

6   the sole African-American on the jury, which led to that juror's removal.  Second, she

7   requested that the jury be excused before the public, which included Petitioner's family

8   members, to prevent encounters between them while leaving the courtroom during

9   breaks.

10         The California Court of Appeal summarized the relevant factual background to

11  this claim as follows:

12               Juror No. 5/67 was initially called as part of a panel of 80
          prospective jurors on the first day of the first trial, May 26, 2009. A second
13        panel was called on May 27. Members of the panels not seeking hardships
          were asked to return on May 28. Juror No. 5/67 filled out a questionnaire
14        on May 26, and was asked to return on May 28.
                 Jury voir dire took place on May 28 and 29. The first mention of
15        Juror No. 5/67 occurred when the court stated to him, "I'm going to come
          back to you because I know you told us at the beginning that you might
16        know people. So I am going to skip you for just a minute, okay?" Juror No.
          5/67 was thereafter questioned out of the presence of the other jurors about
17        his report, apparently made on May 26, that he recognized defendant
          Hudson.
18               Juror No. 5/67 reported his son played basketball at Pittsburg High
          School with one of the defendants who he remembered as "Darryl." He
19        stated he never knew Darryl's last name until he had heard his last name in
          the courtroom a few days earlier. He told the court he had mentioned it to
20        his wife when he was outside the courtroom with her during a recess in the
          jury selection process. At first, Juror No. 5/67 said he had decided to go
21        back in the courtroom and tell the bailiff he recognized Darryl but later
          stated it was his wife who sent him back inside. He explained he helped
22        coach the freshman basketball team when his son was a freshman. Darryl,
          who was two years older than the juror's son, was on the varsity team,
23        which practiced separately. Juror No. 5/67 could not remember the first
          names of any of the other varsity players. Defendant Hudson's attorney
24        asked Juror No. 5/67 if there was "[a]nything in that relationship that you
          described that would make you less than fair and impartial if chosen as a
25        juror." Juror No. 5/67 answered in the negative.
                 Juror No. 5/67 was one of the 12 jurors later sworn in on May 29.
26        After the end of the session on Friday, May 29, Juror No. 9 sent the
          following note to the court: "On Tuesday [May 26] while you were
27        interviewing the people with hardship requests, I believe it was [Juror No.
          5/67] who said he knew Daryl [sic ] and when he left he told his wife if he
28        could get him off he could [sic ]. This may or may not have been said with
          true intent." On the next court day, Monday, June 1, the court had

7

discussions with Juror No. 9 and with Juror No. 5/67.

Juror No. 9 reported she was sitting outside the courtroom, near Juror No. 5/67 and his wife, when they started discussing the case: "[H]e said that he recognized Darryl and he didn't know what he had been charged with. And I believe his wife made a phone call and said that it was Darryl and they just didn't know what he was charged with. And then as they were leaving, he made the comment that I wrote down. [¶] ... [¶] He obviously didn't know the seriousness of the charge. But it was just like, Hey, if I can get him off, I will. [¶] ... [¶] It wasn't like a serious, I want to get on this case so that I can get him off. It was just the fact that he knew him and said that."

The court also questioned Juror No. 5/67. He stated he came out of the courtroom during a break on May 26 and spoke to his wife who was waiting for him outside the courtroom. He reported he told her: "That look [sic ] like one of the kids that my son played basketball with, you know." He said his wife told him he had to go back into the courtroom and tell them he knew the defendant. When the trial court asked Juror No. 5/67 if he "might have said something to the effect of that if you could get Darryl off you would," he responded by repeating the word "no" 11 times, according to the transcript. He also said, "I don't know him that well—why would I say something like that?" The court bailiff was also questioned, and confirmed Juror No. 5/67 had come up to him and said, "I know him," pointing to defendant Hudson.

The prosecutor argued Juror No. 5/67 should be removed. Hudson's trial counsel objected to his removal. The trial court observed that Juror No. 9's allegation concerning Juror No. 5/67 was "exceptionally serious" and, having questioned both jurors in open court, found Juror No. 9 to be "very, very credible." The court found Juror No. 9 had no ulterior motive to come forward, and had done so reluctantly, feeling she had a duty to do so. The court noted Juror No. 5/67 had himself corroborated Juror No. 9's statement that he and his wife had spoken about the defendant outside the courtroom on May 26. The court specifically found Juror No. 5/67 was not credible, noting he first adamantly denied saying anything about getting Darryl off but when the court asked him if he could have said it in jest, he paused and seemed to be "clearly evaluating" whether he should admit he said it in jest. The court found Juror No. 5/67 had actual bias and excused him from the jury.

...

On the morning of the 10th day of trial the court informed the parties it had received the following note from Juror No. 9: "Is it possible for the jury to leave the courtroom 30–120 seconds before the audience? I know I would feel more at ease if we could. No one has said anything to me or made any gestures or anything like that. There are just so many spectators and with the [sic ] type of case, I would feel safer with a head start at lunch breaks and at the end of the day."

The defense jointly moved that the court inquire into the juror's concerns and expressed trepidation about her motivations for submitting the note. Counsel for defendant Hall noted audience members had conducted themselves well throughout the trial. Counsel reminded the court this was the same juror who reported overhearing Juror No. 5/67's statement, and stated, "I'd like to know what's going on with her." The prosecution took the position the defense was "reading way too much into this," pointed out it was not unusual to permit jurors to exit before

United States District Court
For the Northern District of California

audience members, and this type of request did not support a further inquiry of the juror.

The court rejected the defense request, explaining its reasons in relevant part as follows: "[M]y job now that she is a sworn juror is not to probe or to inquire into any things that we would have wanted to elicit on voir dire.... And her note doesn't give me any reason to question her. She's explained herself fully. [¶] Every time we get a note from a juror, for example, wanting to know evidence, ... I don't question them to say does this mean you're leaning one way or the other. Their thoughts are their own. At this point I'm not going to question her further, but I will honor her request and have the audience stay while the jury exits."

*Hudson*, WL 676404 at 4-7.

The California Court of Appeal denied Petitioner's claim based on the following:

The decision whether to retain or discharge a sworn juror rests within the sound discretion of the trial court. (§ 1089;9 *In re Devlin* (1956) 139 Cal.App.2d 810, 813, *overruled on another ground* in *Larios v. Superior Court* (1979) 24 Cal.3d 324, 333.) "A sitting juror's actual bias, which would have supported a challenge for cause, renders him 'unable to perform his duty' and thus subject to discharge and substitution." (*People v. Keenan* (1988) 46 Cal.3d 478, 532.)

"Although decisions to investigate juror misconduct and to discharge a juror are matters within the trial court's discretion [citation], ... 'a somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal. [Citation.] ... [T]he basis for a juror's disqualification must appear on the record as a 'demonstrable reality.' This standard involves 'a more comprehensive and less deferential review' than simply determining whether any substantial evidence in the record supports the trial court's decision. [Citation.] It must appear 'that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion that bias was established.' [Citation.] However, in applying the demonstrable reality test, we do not reweigh the evidence. [Citation.] The inquiry is whether 'the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 589–590 (*Lomax*).) Few cases have found abuse of discretion in the discharge of a juror for bias. (*People v. Halsey* (1993) 12 Cal.App.4th 885, 892.)

[]The trial court made the basis for its decision to discharge Juror No. 5/67 clear on the record. The court believed Juror No. 9 that Juror No. 5/67 had told his wife outside of the courtroom he would try to get Hudson off if he could, and it found Juror No. 5/67 was being dishonest when he denied having made that statement. The court explained its reasons for making those determinations of credibility and fact in some detail. We are not free to reweigh the evidence and arrive at a different conclusion than the trial court did about whether Juror No. 5/67 made the statement attributed to him. (*Lomax, supra*, 49 Cal.4th at p. 590; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1053.) Moreover, Hudson essentially concedes, as he must, that the statement the court found Juror No. 5/67 made would show bias justifying the juror's replacement unless it was said entirely in jest.

9

United States District Court

For the Northern District of California

Contrary to Hudson's suggestion, the trial court was not required to accept Juror No. 9's view that Juror No. 5/67 might not have been serious when he said he would try to get Hudson off. Juror No. 9's original note said the statement "*may or may not* have been said with true intent." (Italics added.) In other words, the note expressed doubt, not certainty about whether he was serious or not. Like most people, Juror No. 9 might have had trouble believing anyone could be serious about doing such a thing. The fact she wrote and submitted the note rather than ignoring the incident is evidence she entertained serious doubt about Juror No. 5/67's intent. Nor do we do find anything in Juror No. 9's testimony to indicate certainty on her part that he made the statement facetiously. She testified Juror No. 5/67 was not laughing when he made the statement, but beyond that she had no way of knowing for certain whether he meant what he said. Juror No. 5/67 was a complete stranger to her and she had no experience with him to draw upon in making such a determination. On this record, the court had to reach its own conclusion about how serious Juror No. 5/67 was when he made the statement. Juror No. 5/67's lack of credibility compounded the problem. It called all of his statements to the court into question, including his statements minimizing the extent of his relationship with Hudson. In these circumstances, the court was entitled to conclude the risk of actual bias was simply too great to allow Juror No. 5/67 to sit on the jury. In our view, the trial court's conclusion was correct and fully supported by the evidence on which it actually relied. (*Lomax*, *supra*, 49 Cal.4th at p. 590.)

....

"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] ... [¶] ... [A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." (*People v. Ray* (1996) 13 Cal.4th 313, 343.) Not every incident involving a juror's conduct requires or warrants further investigation. (*People v. Cleveland* (2001) 25 Cal.4th 466, 478.) A mere supposition of misconduct does not require investigation. (*People v. Marshall* (1996) 13 Cal.4th 799, 864.)

[]The trial court acted within its discretion in declining to conduct an inquiry in response to Juror No. 9's request. Nothing in the juror's request was so unusual or indicative of possible bias or misconduct that an inquiry was required. Defense counsel articulated no more than an inchoate fear something unspecified might be "going on" with this juror, based merely on her having twice sought the court's attention in 10 days of trial. There was not enough here to warrant interrupting the trial in order to put this juror under a microscope for making a simple and relatively routine request. Moreover, appellate counsel points to no evidence in the record suggesting Juror No. 9 did not fully and fairly discharge her duties throughout the trial. We find no error.

*Hudson*, WL 676404 at 4-7.

A.   Equal Protection

Petitioner claims that the removal of Juror No. 5/67, the sole African American

United States District Court

For the Northern District of California

juror, and Juror No. 9's own bias violated his equal protection rights.  The exclusion of jurors based upon their race gives rise to an equal protection claim on behalf of the excluded juror when such exclusion takes place during jury selection.  *Powers v. Ohio*, 499 U.S. 400, 406 (1991); *see also Batson v. Kentucky*, 476 U.S. 79, 84 (1986).  However, this Court is aware of no Supreme Court authority, and Petitioner does not cite any, extending this protection to the substitution of a juror during trial.  It is conceivable that substitution of the only African-American person on a jury could be based on improper racial discrimination.  However, under AEDPA, federal habeas relief is only available when the state courts contradict or unreasonably apply "clearly established federal law" as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).  As there is no such Supreme Court authority extending *Batson*-type equal protection claims to the removal or substitution of an empaneled juror trial, under AEDPA, Petitioner cannot obtain federal habeas relief on this claim under the Equal Protection Clause.

B.     Sixth Amendment

Petitioner's arguments that the removal of Juror 5/67 and the presence of Juror No. 9 resulted in a racially biased jury implicate the Sixth Amendment guarantee a trial by impartial jurors.  *See* U.S. Const. Amend. VI.

This Court first addresses the substitution of Juror No. 5/67, the only African-American on the jury.  The Sixth Amendment right to a jury trial is violated when a juror is substituted without good cause.  *See Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997); *Hedlund v. Ryan*, 750 F.3d 793, 808 (9th Cir. 2014).  A juror's actual bias certainly constitute's good cause for removing him because removing biased jurors falls well within the bounds allowed by the Sixth Amendment.  *See*, *e.g.*, *Fields v. Brown*, 503 F.3d 755, 766 (9th Cir. 2007) (en banc); *Hedlund*, 750 F.3d at 808.  The trial court removed Juror No. 5/67 based upon a finding that he was actually biased in favor of Petitioner.  The question is whether Juror No. 5/67 did have an actual bias such that there was good cause for his removal.

A state court's finding of juror bias is a factual finding, *see Dyer*, 151 F.3d at 973.

11

In this case, the state courts found actual bias based upon evidence that is in the state court record, which means that this Court must uphold the finding it amounts to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *See* 28 U.S.C. § 2254(d)(2); *Cook v. Lamarque*, 593 F.3d 810, 816 (9th Cir. 2010).

Based upon the evidence presented in the state court proceedings, the state court could reasonably conclude that Juror No. 5/67 had an actual bias. Juror No. 9 informed the court that Juror No. 5/67 told his wife during a recess that he would exonerate Petitioner regardless of the evidence. Juror No. 5/67 denied saying so, but the trial court did not find him credible. This credibility finding is also a fact finding, *see Fields*, 503 F.3d at 767, that must also be upheld under Section 2254(d)(2) so long as it is a reasonable conclusion based upon the evidence presented in state court. The evidence presented in state court reasonably indicates that Juror No. 9 told the truth about Juror No. 5/67. She had no apparent motive to lie. She exhibited reluctance in reporting Juror No. 5/67's statement to the trial court. She offered an explanation on behalf of Juror No. 5/67 that he may not have made the statement in earnest. The trial court was not required to accept her speculation that Juror No. 5/67 made the statement facetiously. Juror No. 9 indicated that she was simply speculating about this possibility, and there was no other evidence — such as testimony from Juror No. 5/67 himself — to indicate that Juror No. 5/67 was in fact joking when he made the statement. The trial court could reasonably rely upon these facts to conclude that Juror No. 9's report was true. Therefore, under Section 2254(d)(2), this Court must defer to the trial court's finding that Juror No. 5/67 was not credible, and that he had in fact told his wife that he would exonerate Petitioner. Based on the fact that Juror No. 5/67 not only knew Petitioner but had said he would exonerate him, the trial court could reasonably conclude that Juror No. 5/67 had an actual bias in favor of Petitioner. As such a bias constitutes good cause for the removal of a juror, his removal did not violate the violate the Sixth Amendment right to a jury.

United States District Court

For the Northern District of California

1    Next, the Court addresses Petitioner's argument that the Juror No. 9 was racially

2    biased, and that her presence on the jury therefore violated his right to an impartial jury.

3    The Sixth Amendment right to an impartial jury is violated when a member of the jury

4    has an actual bias. *See Fields v. Brown*, 503 F.3d 755, 766 (9th Cir. 2007) (en banc); see

5    also *Hedlund v. Ryan*, 750 F.3d 793, 808 (9th Cir. 2014) (under "clearly established"

6    Supreme Court precedent, as required by AEDPA, there must be a showing of actual bias

7    to establish Sixth Amendment violation).  Petitioner argues that Juror No. 9's racial bias

8    is evinced by her statement that she would feel safer if she were released from the

9    courtroom prior to the spectators, which included Petitioner's family.  Petitioner does not

10   indicate the race of his family members or the other spectators, but the Court presumes

11   that the basis of Petitioner's argument is that at least some of them were African-

12   American.  In addition, it appears that Petitioner contends that Juror No. 9's reporting the

13   comments of Juror No. 5/67, who is African-American, also reflected her bias against

14   African-Americans generally.

15       The state courts could reasonably reject Petitioner's argument that Juror No. 9 had

16   an improper bias.  Her request to be released early on its face did not reflect racial bias.

17   She did not single out Petitioner's family or African-American members of the audience

18   as the ones making her uncomfortable, but rather described her discomfort with the

19   audience as a whole due to their large numbers and the crimes at issue.  In addition, as

20   the state court found, such a request from a jury is not unusual.  Secondly, Juror No. 9's

21   reporting the comments from Juror No. 5/67 was not on its face discriminatory.  She may

22   have had a discriminatory motive, insofar as he was the only African-American on the

23   jury, but she could just as well have been motivated by her sense of responsibility as a

24   juror.  The fact that there were reasonably grounds to indicate that her report was true,

25   i.e. that Juror No. 5/67 had in fact made comments that would indicate his bias towards

26   the defense, tends to indicate that she acted out of a sense of responsibility as a juror and

27   not out of racial bias against African-Americans.  There were also no other indicia in her

28   voir dire answers or elsewhere of her being racially biased.  Under such circumstances,

**United States District Court**
For the Northern District of California

the state courts reasonably found that Juror No. 9 did not have a racial or other actual

bias against Petitioner that would preclude her from serving on the jury under the Sixth

Amendment.  Accordingly, the state courts denial of Petitioner's claim was not an

unreasonable application of or contrary to federal law.

       C.    Due Process

        Due process only means a jury capable and willing to decide the case solely on

the evidence before it and a trial judge ever watchful to prevent prejudicial occurrences

and to determine the effect of such occurrences when they happen.  *Smith v. Phillips*,

455 U.S. 209, 217 (1982). Such determinations may properly be made at a hearing.  *Id.*

Rather than ordering a new trial any time the issue of juror bias arises, holding a hearing

to determine actual bias is the appropriate course of action.  *Id.*  Here, the trial court held

a hearing before removing Juror No. 5/67.  The trial court did not hold such a hearing

when Juror No. 9 made her request about being released before the audience, but due

process did not require such a hearing.  Clearly established federal law, as determined by

the Supreme Court, does not require state or federal courts to hold a hearing every time a

claim of juror bias is raised by the parties. *Tracey v. Palmateer*, 341 F.3d 1037, 1045

(9th Cir. 2003).  Due process does not require the trial court to question the jurors

alleged to have bias any time evidence of juror bias comes to light.  *Id.*  For the reasons

discussed above — the request to be released early was not unusual, it did not indicate a

racial or other bias against Petitioner, and there were no other indications of Juror No. 9

having a bias — the conclusion that Juror No. 9's request did not sufficiently indicate

impartiality to warrant a hearing is a reasonable application of federal due process law.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

II.    Sufficiency of Evidence

        Petitioner claims that his rights to due process and equal protection were violated

because there was insufficient evidence to prove his guilt beyond a reasonable doubt.  He

argues that there no physical or eyewitness evidence implicated him, and instead, the

verdict rested upon the "obviously fabricated" testimony of his co-defendant Amos, who

1   was "desperately trying to solidify a deal to not get the death penalty."

2      The Due Process Clause "protects the accused against conviction except upon

3   proof beyond a reasonable doubt of every fact necessary to constitute the crime with

4   which he is charged." *In re Winship,* 397 U.S. 358, 364 (1970).  A state prisoner who

5   alleges that the evidence in support of his state conviction cannot be fairly characterized

6   as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt

7   therefore states a constitutional claim which, if proven, entitles him to federal habeas

8   relief. *Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979).

9      The Supreme Court has emphasized that "*Jackson* claims face a high bar in

10   federal habeas proceedings. . .." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per

11   curiam).  A federal court reviewing collaterally a state court conviction does not

12   determine whether it is satisfied that the evidence established guilt beyond a reasonable

13   doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court determines

14   only whether, "after viewing the evidence in the light most favorable to the prosecution,

15   any rational trier of fact could have found the essential elements of the crime beyond a

16   reasonable doubt." *Jackson*, 443 U.S. at 319.  Only if no rational trier of fact could have

17   found proof of guilt beyond a reasonable doubt, has there been a due process violation.

18   *Id.* at 324.

19      A reasonable jury could have found Petitioner guilty of the crimes.  To begin with,

20   there was Amos's testimony identifying Petitioner as one of the accomplices.  Petitioner

21   argues that Amos was not credible because of the immunity agreement with the

22   prosecutor.  However, there were reasonable grounds for finding his testimony credible

23   notwithstanding the immunity agreement.  To begin with, Amos's description of the

24   crime was detailed and accurate, and it matched the forensic evidence, including the

25   nature of the wounds to the victims, the gunshot evidence, and the victims' missing

26   property.  Secondly, Amos's implication of Petitioner was corroborated by a variety of

27   other sources.  Omar Zuniga and Jalil Aldridge (non-accomplices) confirmed that

28   Petitioner participated in the robbery-murder.  Aldridge also indicated that Petitioner

United States District Court

For the Northern District of California

15

United States District Court

For the Northern District of California

1    provided him with the victim's gun, which had been stolen in the robbery.  James and

2    Linda High connected Petitioner to property stolen in the robbery: James High stated that

3    Petitioner, Hall, and Amos brought bags of marijuana and the gunsafe to his house on the

4    day of the robbery, and Linda High told the police that she sold a computer stolen from

5    the victim on behalf of Petitioner.  All of this corroborating evidence allowed a

6    reasonable jury to find Amos's testimony credible notwithstanding Amos's immunity

7    agreement, and to find that Petitioner was one of the participants in the crime.

8         Petitioner's argument that there was no eyewitness or "physical" evidence

9    implicating Petitioner is beside the point.  Such evidence is not required by due process.

10   As explained above, all that due process requires is enough evidence for a reasonable

11   juror to find guilt beyond a reasonable doubt.  Amos's detailed testimony matching the

12   forensic evidence found at the scene and corroborated both by other witnesses and

13   Petitioner's connection to property stolen from the victims during the robbery-murder

14   constituted more than sufficient evidence for a jury to reasonably find that Petitioner was

15   one of the accomplices to the crime.  Accordingly, the state courts' denial of this claim

16   was neither contrary to nor an unreasonable application of federal law, and Petitioner is

17   not entitled to habeas relief on this claim.

18   III.   Ineffective Assistance of Trial Counsel

19        Petitioner claims that trial counsel was ineffective in failing to introduce a video

20   recording of a news broadcast covering the crimes.  According to Petitioner, the recording

21   was dated the day after the crime, and this establishes that witnesses were mistaken in

22   testifying that they watched the broadcast with Petitioner, Amos and Hall on the day of

23   the crimes.

24        The Sixth Amendment guarantees the right to effective assistance of counsel.

25   *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To prevail on a claim of ineffective

26   assistance of counsel, Petitioner must show both that counsel's performance was deficient

27   and that the deficient performance prejudiced Petitioner's defense.  *Id.* at 688.  To prove

28   deficient performance, Petitioner must demonstrate that counsel's representation fell

16

**United States District Court**
For the Northern District of California

1  below an objective standard of reasonableness under prevailing professional norms.  *Id.*

2  To prove counsel's performance was prejudicial, Petitioner must demonstrate a

3  "reasonable probability that, but for counsel's unprofessional errors, the result of the

4  proceeding would have been different.  A reasonable probability is a probability sufficient

5  to undermine confidence in the outcome."  *Id.* at 694.  A court need not determine

6  whether counsel's performance was deficient before examining the prejudice suffered by

7  the defendant as the result of the alleged deficiencies.  *See id.* at 697.

8          Petitioner's claim is premised upon the date written on the outside of the VHS tape

9  being the date after the crimes.  Even if true, this does not mean that the witnesses were

10  wrong that there were news broadcasts about the crime on the evening of the crime.  Such

11  broadcasts could have been on a different tape or a different channel, or could have been

12  included on the tape but not noted on the outside of the box.  Furthermore, counsel could

13  have reasonably chosen not to introduce the tape because even if it demonstrated an

14  inaccuracy in the date of the broadcast, it would have also corroborated details in Amos's

15  testimony about the crime.  As such, counsel could reasonably decide not to risk

16  bolstering Amos's credibility by introducing the tape.  *See Strickland*, 466 U.S. at 689

17  (court must be highly deferential and indulge strong presumption that counsel's decisions

18  fall within wide range of reasonable professional assistance).  Finally, whether the

19  broadcast took place before or after midnight on the night of the crimes has virtually no

20  importance to the case; a one-day discrepancy in the witnesses' recollection is minor,

21  does not seriously call into question their credibility, and is not related to the substance of

22  their testimony. Under these circumstances, the state courts could reasonably conclude

23  that counsel's performance was either not deficient, not prejudicial, or neither under the

24  *Strickland* standard.  Accordingly, Petitioner was not entitled to habeas relief on this

25  claim.

26  IV.    Ineffective Assistance of Appellate Counsel

27          Petitioner claims that appellate counsel was ineffective in failing to raise, on

28  appeal, a claim of prosecutorial misconduct.  Claims of ineffective assistance of appellate

17

1   counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466

2   U.S. 668 (1984).  First, the petitioner must show that counsel's performance was

3   objectively unreasonable, which in the appellate context requires the petitioner to

4   demonstrate that counsel acted unreasonably in failing to discover and brief a

5   merit-worthy issue.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Second, the petitioner

6   must show prejudice, which in this context means that the petitioner must demonstrate a

7   reasonable probability that, but for appellate counsel's failure to raise the issue, the

8   petitioner would have prevailed in his appeal.  *Id.* at 285–86.  It is important to note that

9   appellate counsel does not have a constitutional duty to raise every nonfrivolous issue

10  requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).  The weeding

11  out of weaker issues is widely recognized as one of the hallmarks of effective appellate

12  advocacy.  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Appellate counsel

13  therefore will frequently remain above an objective standard of competence and have

14  caused his client no prejudice for the same reason – because he declined to raise a weak

15  issue.  *Id.*

16       The prosecutorial misconduct alleged by Petitioner is that the prosecutor

17  knowingly elicited false testimony when questioning James High.  Knowingly using

18  material false evidence violates due process.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

19  Petitioner points to the prosecutor's statement at the end of the preliminary hearing that

20  there was not sufficient evidence that Petitioner was the shooter.  Petitioner claims that

21  this means the prosecutor did not have the right to ask James High at trial about seeing

22  Petitioner before the crimes with the same type of gun as the murder weapon.

23       The prosecutor's questions did not contradict his statement at the preliminary

24  hearing.  At the preliminary hearing, the prosecutor did not say that he knew that

25  Petitioner was not the shooter, only that there was not enough evidence to prove that he

26  was.  When he questioned James High at trial, the prosecutor could have been exploring

27  new evidence he did not know about at the preliminary hearing.  More importantly, he did

28  not ask James High whether Petitioner was the shooter, only whether Petitioner had the

1 | gun before the crimes, which Petitioner could have done without being the shooter at the

2 | crimes.  Therefore, there is no indication that the testimony the prosecutor sought from

3 | James High was evidence that the prosecutor knew to be false.  As a result, there is no

4 | showing that the prosecutor committed misconduct, and if appellate counsel had

5 | attempted to bring such a claim on appeal, the claim would have been meritless.

6 | Accordingly, Petitioner has not shown that appellate counsel was ineffective in failing to

7 | raise a claim of prosecutorial misconduct, and present such a claim.[5]  Habeas relief is not

8 | warranted on this claim.

9 | **CONCLUSION**

10 | For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  A

11 | certificate of appealability will not issue.  *See* 28 U.S.C. § 2253 (c).  This is not a case in

12 | which "reasonable jurists would find the district court's assessment of the constitutional

13 | claims debatable or wrong."  *Slack v. Mcdaniel,* 529 U.S. 473, 484 (2000).

14 | The Clerk shall enter judgment in favor of the Respondent and close the file.

15 | **IT IS SO ORDERED.**

16 | DATED: December 8, 2015

19 | _____
JEFFREY S. WHITE
United States District Judge

---

[5]The Court need not reach Respondent's alternate argument that the claim of ineffective assistance of appellate counsel was not exhausted.